**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| IRIC SALDIVAR, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-08-1820 |
| | § | |
| TEXAS DEPARTMENT OF, | § | |
| ASSISTIVE AND REHABILITATIVE | § | |
| SERVICES, a/k/a DARS, f/k/a TEXAS | § | |
| REHABILITATION COMMISSION, | § | |
| | § | |
| Defendant. | § | |

**MEMORANDUM AND ORDER**

In this suit, which was removed from state to federal court, Iric Saldivar sued his employer, the Texas Department of Assistive and Rehabilitative Services (DARS). Saldivar alleged that he was delayed approximately 18 months in obtaining a promotion after he reported concerns about charges submitted by a DARS vendor. When Saldivar sued DARS in November 2007 in state court, he alleged a violation of the Texas Whistleblower Act, TEX. GOV'T CODE § 554.001, *et seq*. In May 2008, Saldivar amended to add a First Amendment retaliation claim under 42 U.S.C. § 1983. DARS timely removed. After removal, DARS moved for summary judgment on both the state Whistleblower Act and the federal § 1983 claims. (Docket Entry No. 19). Saldivar has responded. (Docket Entry Nos. 24, 25). Saldivar has also moved for leave to amend his complaint to add a claim for negligent retention and supervision and to add as defendants three present or former DARS employees: Terry Smith, Mike Schepperly, and Frankie Watson. (Docket Entry No. 22). DARS opposed the motion for leave to amend. (Docket Entry No. 26).

Based on a careful review of the pleadings; the motions and responses; the summary judgment record; and the applicable law, this court denies Saldivar's motion for leave to amend to add either a new claim or new defendants and grants DARS's motion for summary judgment. Final judgment is entered by separate order. The reasons are explained in detail below.

## I.   The Summary Judgment Evidence[1]

The Texas Department of Assistive and Rehabilitative Services (DARS) is a state agency charged with helping disabled persons find employment opportunities. (Docket Entry No. 25, Ex. R, Watson Depo. at 34). DARS matches disabled persons, whom DARS calls its "consumers," with service providers, referred to as "vendors." The vendors provide the consumers with job training and coaching and job-placement services. The goal is to match the consumers with appropriate employers willing to hire them. DARS facilitates this process through its Vocational Rehabilitation Counselors (VRCs).

Iric Saldivar is a VRC employed by DARS in Houston. (Docket Entry No.1, Ex. 6 at 1-2). Saldivar began working for DARS in 2003, while he was a graduate student in rehabilitation counseling at the University of Texas Pan American. (Docket Entry No. 19, Ex. 2, Saldivar Depo. at 4-8). As a VRC, Saldivar serves as an intermediary between consumers and vendors. He meets with the consumer to develop a work plan and a set of goals. The VRC's relationship with the consumer is more important to DARS than the vendor's relationship with the consumer. If the VRC

---

[1] The summary judgment record includes the following: Iric Saldivar's deposition, volume 1, (Docket Entry No. 19, Ex. 2), and volume 2, (Docket Entry No. 25, Ex. S); Terry Boyce's deposition, (*Id.*, Ex. Q); Frankie Watson's deposition, (*Id.*, Ex. R); Saldivar's employment application, performance reviews, and approved promotions, (*Id.*, Exs. A - F); Saldivar's recommendations for promotion to VRC III, (*Id.*, Exs. J-N); Saldivar's e-mails to Terry Boyce and Stephanie Jenkins, (*Id.*, Ex. H, I); Saldivar's confidentiality agreement with DARS, (*Id.*, Ex. O); Saldivar's expert report on economic loss, (*Id.*, Ex. P); and Saldivar's original petition and proof of service, (Docket Entry No. 19, Ex. 3).

and the vendor propose divergent options for the consumer's employment, the VRC's plan is controlling.  (Docket Entry No. 25, Ex. Q, Boyce Depo. at 24-26).

Before a vendor may provide services to a consumer under a plan, the vendor submits a proposal to the VRC for a certain number of training or coaching hours for that consumer.  The VRC reviews the proposal and determines whether to authorize the hours.  If the hours are "consistent with policy," the VRC generates a purchase order.  After the consumer has received the approved training or coaching, the vendor sends an invoice to the VRC with documents showing the services provided.  The VRC's administrative assistant then authorizes the payment.  Alternatively, the administrative assistant could create the purchase order.  Under DARS policy, the same employee may not both generate the purchase order and authorize payment.  (Docket Entry No. 19, Ex. 2, Saldivar Depo. at 22, 25-27).

Saldivar began working with DARS as a VRC trainee on January, 27, 2003.  (Docket Entry No. 25, Ex. B).  On November 1, 2003, he was promoted from VRC trainee to an entry-level VRC, a VRC I.  (*Id.*, Ex. D.).  On October 1, 2004, he was promoted to VRC II.  (*Id.*, Ex. G).  On both occasions, Terry Boyce, the DARS Area Manager assigned to supervise Saldivar's office, recommended Saldivar for promotion.  Frankie Watson, Boyce's supervisor and the DARS Regional Director responsible for the Gulf Coast area, approved both recommendations.  (*Id.*, Exs. D, E).

In 2005, while working as a VRC II, Saldivar placed consumers with a vendor named James Olson.  Olson was the director of Association for the Developmentally Disabled (ADD), and the husband of Kim Olson, a DARS employee in the North Houston office.  Saldivar worked in the South Houston office.  DARS recognized the potential conflict of interest created by the Olsons' relationship and instituted a policy under which Kim Olson was not allowed involvement in providing consumers for her husband's business.  (*Id.*, Ex. R, Watson Depo. at 21-23).  On  several

3

occasions, DARS personnel reported problems with James Olson, apparently involving "very shoddy" paperwork that the VRC or another DARS employee would have to "go back and correct." (*Id.* at 24).  When asked about the specific problems with Olson's paperwork, Watson testified that there were "[b]lank forms and clients.  Sometimes he would not have his billing hours correct. Sometimes he would not have the description of the service he provided, yet he provided the service. That kind of stuff."  (*Id.* at 25).

Saldivar has never met Olson in person.  The first contact he recalls with Olson was over the telephone.  Olson called Saldivar to report that he had found a security-guard job for a consumer named "J.C."  Olson reported that J.C. was excited about the work and had asked Olson to arrange for the job to begin.  Saldivar denied Olson's request because "the consumer was currently doing his internship and finding a job as a security guard has nothing to do with the consumer's vocational goal."  (Docket Entry No. 25, Ex. I at 1).  Saldivar told Olson that DARS had "provided [J.C.] with office skills training" and that any job assignment given to J.C. must fall under the category of "office skills job (office helper)," because a security guard job "would defeat the agencies purpose for providing the consumer with office skills training."  (*Id.*).

Saldivar later received a call from a consumer named "A.F." requesting job coaching and job placement assistance from Olson.  A.F. had decided to abandon his existing placement and switch to Olson's services.  Under DARS policy, Saldivar respected the consumer's choice and approved the request.  Some time later, Olson called Saldivar to report that he had found a job for A.F. with Aramark operating the trash chute at Minute Maid Park in Houston.  Olson asked Saldivar to approve 50 hours of job coaching for that placement.  According to Saldivar, Olson failed to disclose that the job only would last two or three weeks.  Saldivar apparently approved the requested 50 hours.  (*Id.*).

4

Olson sent Saldivar A.F.'s time log for the initial job coaching.  As part of the log, Olson

requested 100 additional hours of job coaching for A.F.  Saldivar called Olson on August 26, 2005

to discuss that request.  (*Id.*)  Saldivar described Olson's attitude during that call as "pushy" and

"rude."  (Docket Entry No. 19, Ex. 2 at 24).  Saldivar told Olson that he needed to review the job

logs for A.F. before approving the request.  Saldivar learned that A.F.'s job was set to expire in two

weeks and "didn't feel it was appropriate to give an additional 100 hours when the job was going

to end and [A.F.] was going to have a totally different job title."  Spending money on such training

would be "a waste."  (*Id.* at 27).  On receiving this information, Olson protested and said "well, I

need more. . . . I can ask for whatever I want.  It can be 1,000, 2,000, 3,000 dollars, as long as I can

show progress." (*Id.* at 28).  Saldivar told Olson that if the logs had justified additional hours, he

would have approved them, but, according to Saldivar, Olson was not satisfied with that answer.

Saldivar's deposition includes the following exchange about his conversation with Olson:

> Q: Uh huh. So, you mentioned – did [Olson] threaten you at that
> point?
>
> A: He was threatening me that he knew the regional office, he knew,
> you know, the Congressman, he knew Austin, and all of this stuff.
>
> Q: Uh huh. So, how did you respond to that?
>
> A: I told him I didn't care. I wasn't going to lose my job for anyone,
> that I still had to follow policy and procedure.
>
> Q: And how did you all leave it?
>
> A: He was yelling and yelling and yelling, and I said, "Well, this is
> the end of our conversation. Thank you." And I said "good bye."
>
> Q: Do you remember what he was yelling in particular?
>
> A: Just that, you know, I shouldn't question, that he can ask for how
> ever much money he wants . . . .

5

(*Id.* at 29).

Saldivar called Terry Boyce to tell her about the conversations with Olson.  Boyce instructed Saldivar to send an e-mail documenting his experience with Olson.  (*Id.* at 31).  On August 30, 2005, Saldivar sent a three-page e-mail to Boyce and Stephanie Jenkins, a DARS community relations specialist responsible for locating and supervising vendors.  (*Id.* at 35; Docket Entry No. 25, Ex. I).  The e-mail described the phone call between Olson and Saldivar about J.C., the phone call between Saldivar and A.F., as well as the follow-up conversations between Olson and Saldivar about A.F.'s placement and job coaching hours.  (*Id.* at 1-2).

Saldivar also included a bullet-point list of comments on entries in A.F.'s job log.  Those comments were as follows:

- Why is Mr. Olson charging the agency for 5 hours of job coaching on 8-11-2005 from 4:30 p.m. to 9:30 p.m? This does not seem like job coaching instead it seems as if this is orientation provided by the consumer's employer such as a general orientation where to get his uniform, where to clock in, where to pick up his paychecks, get supplies?

- Again, on 8-12-2005 another 5hrs of job coaching from 4:30pm - 9:30pm.  Why is the job coach reviewing general orientation such as regulations and policy as well as procedures of the company?  It also fails to explain how the consumer was shown the position of trash chute operator. There are no steps to explain this process.

- Then on 8-14-05 another 5hrs for job coaching from 11:00 a.m.(sic) to 4:00 a.m. in the morning why would the job coach call the consumer's past employment so early in the morning and why would the job coach ask for the consumer to be rehired from his past employment when the consumer is currently employed with Aramark and both the agencies goal and the vendors goal is to assist the consumer to learn his new vocational goal as a trash chute operator?  Again the job coach fails to explain how he spend the entire shift going over old work mistakes?  All the job coach states is that the job coach is taking the consumer along very slowly.

6

- Then on 8-19-2005 from 4:30 p.m. to 9:30 p.m. for another 5hrs the job coach indicates that the consumer understands the basic concept concerning to running the machine (trash chute operator), but has problems with getting around the stadium to and from his workstation.  Which again fails how the job coach taught the consumer this task.

- Then on 8-20-2005 from 3:00 p.m. to 8:00 p.m. for another 5 hrs the job coach states the consumer reported to work very upset due to a situation that occurred with another worker or employee that lived with him at the group home (please view log sheet to get a better understanding on this date).[2]  It is hard for [me] to believe it would actually take a job coach 5 hrs to address this issue.  Again the job coach fails to explain the proper steps on how he counseled with the consumer.

- The (sic) on 8-21-2005 from 11:00 a.m. to 4:00 p.m. the vendor states he provided another 5 hrs of job coaching.  The job coach explains that the consumer is immature and needs help in all aspect of the job at this time again fails to justify exactly what problems the consumer is having.  Again, this contradicts information provided on 8-19-2005.  The job coach then states that the consumer does not know his way to the head quarters instead the consumer is going all the way up to the fourth floor to the job coach's office.  A reason to this night be because the consumer is probably meeting with the job coach every morning.  The job coach is then requesting an additional 100 hrs knowing that this job is not a permanent job.

(*Id.* at 2-3).

The e-mail also describes additional events.  On August 30, 2005, Jeff Mayer, the owner of A.F.'s group home, called to ask Saldivar about some things that Olson had said.  Mayer left a voice mail message for Saldivar, explaining that Olson had told Mayer that Saldivar had told Olson that Saldivar no longer wanted A.F. to work in any capacity.  Saldivar called Mayer back.  Saldivar then called Olson to clarify that he had not said he wanted A.F. to discontinue working.  At that point,

---

[2]  It is unclear from the record what about this date the log sheet might have revealed.

according to Saldivar, Olson "changed everything" by threatening to call the DARS commissioner. (*Id.* at 3).  Around the same time, Olson called DARS to complain about Saldivar's "temperament." It is unclear to whom Olson directed his complaint, but it eventually reached Watson.  (*Id.*, Ex. R, Watson Depo. at 40-43).

Saldivar testified that he sent the e-mail to Boyce and Jenkins because he felt Olson's conduct was a "serious problem."   Saldivar explained that in his view, Olson "was not only exploiting consumers, he was also exploiting the State."  (Docket Entry No. 19, Ex. 2, Saldivar Depo. at 34-35).  The e-mail's tracking function reveals that Boyce read it on August 30 at 5:28 p.m.– two minutes after Saldivar sent it – and Jenkins read it the next day at 9:19 a.m. (Docket Entry No. 25, Ex. I at 1).  Boyce testified that she believes she forwarded Saldivar's e-mail to Frankie Watson.  (*Id.*, Ex. Q, Boyce Depo. at 68).  Watson testified that she was made aware of Saldivar's complaint.  (*Id.*, Ex. R, Watson Depo. at 63).  On September 8, 2005, Saldivar sent a second e-mail to Boyce to document his reasons for not paying Olson's invoice.  The e-mail repeated the bullet-point list from Saldivar's earlier e-mail. (*Id.*, Ex. H).

Saldivar met with Jenkins to discuss Olson.  Saldivar recalled few specifics about the meeting but came away with the sense that his complaints would be investigated.  Saldivar also reported his concerns to someone named Francisco Teran or Turon.  Saldivar believed – but was not sure – that this individual was with the Texas Attorney General's office.  Saldivar did not know when this call took place. He recalled telling Teran what had happened and relaying his feeling that Olson was exploiting the State and misusing State funds.  (Docket Entry No. 19, Ex. 2, Saldivar Depo. at 39-41).  Saldivar also recalled discussing James Dunn with Teran.  James Dunn was another DARS vendor who had been discovered submitting false charges, for which he was prosecuted.  Saldivar had not personally dealt with Dunn.  Saldivar called Teran in part because he

8

was concerned that the Olson situation was similar to Dunn's.  (*Id.* at 41-43).  Teran told Saldivar that he would "look into it."  Saldivar believes that Teran called back and asked for names of other people Saldivar had worked with.  Saldivar told Teran that he could not disclose such information and referred him to Boyce.  (*Id.* at 43-44).  The record does not reveal any further actions by Teran. It is unclear from the record whether Boyce, Watson, or anyone else at DARS knew that Saldivar had called Teran.

On January 1, 2006, Boyce sent Watson a memorandum recommending Saldivar for promotion to VRC III.  She wrote that after 12 months as a VRC II, Saldivar had satisfied the experience and education prerequisites, his performance had met or exceeded expectations, and he had shown "evidence of the knowledge, skills and abilities" required of VRC IIIs.  Boyce also provided specific comments on different performance areas.  The final page contained a signature line for Watson and an area where she could mark "Approval" or "Disapproval."  (Docket Entry No. 25, Ex. J).  It appears from the record that Watson took no action in response to Boyce's recommendation.  On February 1, 2006, Boyce submitted the same document again. (Docket Entry No. 25, Ex. K).  Watson again apparently left the memo unmarked and unsigned.

In her deposition, Frankie Watson described the typical promotion, or merit increase, process at DARS.  "If someone is doing something that is outside the normal business, outside the normal job description, then they are eligible for a merit [increase]."  (Docket Entry No. 25, Ex. R at 27). If an employee was "doing more than what's on the job description," the employee's area manager would recommend a merit increase.  Watson would review the recommendation and decide whether a merit increase was warranted.  If an employee's promotion would add managerial responsibilities, Watson would also consult with the Program Director, Mike Schepperly.  As program director, Schepperly was responsible for running the operations related to serving DARS consumers.

9

According to Watson, Schepperly "was the subject matter expert for case management, like whether the case was moving through the process – the [vocational rehabilitation] process appropriately." He was also the "[s]ubject matter expert for job placement, and subject matter expert for individuals who were working in the community." (*Id.* at 34). Watson testified that she would involve Schepperly in promotion evaluations for "individuals who were being promoted or provided merit increases at the Counselor III level." (*Id.* at 27-28). Terry Boyce clarified that, in her experience, this meant employees who were already at the VRC III level and seeking a promotion to VRC IV. (*Id.*, Ex. Q at 27-28). For a VRC I or II seeking promotion, Watson testified that she would review the information from the area manager. If the information "was within the guidelines," Watson would "always" "approve it and move on." (*Id.* at 31).

Boyce continued to believe that Saldivar was qualified to be promoted from VCR II to VRC III. (*Id.*, Ex. Q at 61). On October 13, 2006, she sent Watson another copy of the memo recommending Saldivar for promotion. (*Id.*, Ex. L). Boyce submitted it again on November 30, 2006. (*Id.*, Ex. M). It appears from the record that Watson did not approve or deny either recommendation. At some point, Watson told Boyce "to not really submit it because [Saldivar's] got this complaint from a provider." (*Id.*, Ex. Q at 62-63). Later, Watson told Boyce that "there were problems with [Saldivar's] cases." (*Id.* at 63). Boyce agreed that there were some problems, but not to the extent of barring promotion, noting that similar problems had not stopped other counselors under her supervision from being promoted to VRC III. (*Id.* at 63-64).

In November or December 2006, Boyce told Saldivar that she had recommended him for promotion in the past. It is unclear from the record exactly what she said about the number and nature of the promotion recommendations she had submitted. It was at that time, according to

10

Saldivar, that he realized he had been retaliated against for reporting his concerns about Olson. (*Id.*, Ex. S, Saldivar Depo. at 60-63).

On February 5, 2007, Saldivar filed a Charge of Discrimination with the Texas Workforce Commission. That charge is not part of the record. It apparently included, in addition to retaliation allegations, claims of discrimination based on race, gender, and national origin. (Docket Entry No. 19, Ex. 3, Saldivar Depo. at 51-52).

Around March 2007, Watson assigned Schepperly and Boyce to review Saldivar's casework. Boyce testified that this was unusual because Schepperly was generally not involved in decisions to promote VRC IIs to VRC III. (Docket Entry No. 25, Ex. Q, Boyce Depo. at 58, 137-38). The review resulted in a document that was an exhibit to Boyce's deposition. Although the parties have not included the document in the summary judgment record, some results of the review are apparent from testimony that is part of the record. Schepperly concluded that Saldivar had "poor overall documentation" of the vocational rehabilitation process for 26 of his assigned consumers. Boyce did not agree. Boyce felt that there were some problems but that the overall documentation was not lacking. According to Schepperly's investigation, Saldivar also had "poor quality in consumer contact" with other individuals. (*Id.* at 139-45). After the review was complete, Boyce met with Saldivar, and Saldivar made the corrections to his case work. (*Id.* at 58).

On March 28, 2007, Boyce again submitted her memorandum recommending Saldivar for promotion to VRC III. Watson marked the "Approval" line and signed the document electronically on April 1, 2007. Saldivar's promotion to VRC III was effective April 1, 2007. (*Id.*, Ex. N).

Saldivar filed this lawsuit against DARS in Texas state court on November 5, 2007, asserting only a claim under the Texas Whistleblower Act, TEX. GOV'T CODE § 554.001, *et seq.* (Docket Entry No. 1, Ex. 1). DARS answered, denying all allegations and asserting that its actions were based on

11

information unrelated to Saldivar's report about Olson and that Saldivar's claim was subject to a statutory damages cap.  DARS did not plead immunity from suit.  (*Id.,* Ex. 2).  Saldivar filed a First Amended Petition on December  31, 2007, which did not add claims or parties.  (*Id.*, Ex. 3).  On May 5, 2008, Saldivar filed a Second Amended Petition, which added a claim under 42 U.S.C. § 1983 alleging that in delaying the promotion, DARS had retaliated against Saldivar in violation of his First Amendment speech rights.  (*Id.*, Ex. 6).  DARS filed a notice of removal with this court on June 6, 2008.  (Docket Entry No. 1).

On April 25, 2009, after discovery, including several oral depositions, DARS moved for summary judgment.  (Docket Entry No. 19).  DARS argued that the Whistleblower Act claim was factually and legally deficient.  As to the § 1983 claim, DARS argued that it could not be liable because it was not a "person"under the statute; Saldivar's speech was not constitutionally protected; and Saldivar had no evidence to support his retaliation claim.  (Docket Entry No. 19).  Saldivar then moved for leave to amend his pleadings to add Watson, Schepperly, and Terry Smith, the Assistant Commissioner of DARS, as defendants liable for negligent retention and supervision of DARS employees, particularly Watson.  In the proposed amended complaint, Saldivar also apparently alleged that the new defendants were liable in their individual capacities for the § 1983 claim and the Texas Whistleblower claim.[3]  (Docket Entry No. 22).  DARS opposed the motion for leave to amend.  (Docket Entry No. 26).

The motions and arguments are addressed below.

## II.    Saldivar's Motion for Leave to Amend His Pleadings

---

[3]  Saldivar's proposed amended complaint does not make it clear that he is asserting his § 1983 claim against Watson, Schepperly, and Smith in their individual capacities.  These counts refer to a single "defendant." But Saldivar's motion for leave to amend suggests that he wishes to add the three new defendants in their individual capacities for all claims, including the § 1983 claim.

Rule 15 of the Federal Rules of Civil Procedure requires leave of court for a party to file an amended pleading. FED. R. CIV. P. 15. Leave is freely given but is "by no means automatic." *Little v. Liquid Air Corp.*, 952 F.2d 841, 845–46 (5th Cir. 1992).

Saldivar filed his motion to amend under Rule 15(a) on May 21, 2009. (Docket Entry No. 22). The scheduling and docket control order entered on September 5, 2008 set a December 15, 2008 deadline to amend the pleadings or add new parties and an April 3, 2009 deadline to complete discovery. (Docket Entry No. 9 at 1-2). The Rule 16(b) "good cause" standard, rather than the "freely given" standard of Rule 15(a), governs a motion to amend filed after the deadline set in the scheduling order. *See Parker v. Columbia Pictures Inds.,* 204 F.3d 326 (2d Cir. 2000); *Eastern Minerals & Chems. Co. v. Mahan*, 225 F.3d 330 (3d Cir. 2000); *In re Milk Prods. Antitrust Litig.*, 195 F.3d 430, 437 (8th Cir. 1999); *Sosa v. Airprint Sys., Inc.,* 133 F.3d 1417, 1419 (11th Cir. 1998) (per curiam); *Johnson v. Mammoth Recreations, Inc.*, 975 F.2d 604, 607-08 (9th Cir. 1992); *SIL-FLO, Inc. v. SFHC, Inc.,* 917 F.2d 1507, 1518 (10th Cir. 1990). As one court has noted, "[i]f we considered only Rule 15(a) without regard to Rule 16(b), we would render scheduling orders meaningless and effectively would read Rule 16(b) and its good cause requirement out of the Federal Rules of Civil Procedure." *Sosa*, 133 F.3d at 1419; *see also Johnson,* 975 F.2d at 610 ("[d]isregard of the [scheduling] order would undermine the court's ability to control its docket, [and] disrupt the agreed-upon course of the litigation"); *Riofrio Anda v. Ralston Purina, Co.*, 959 F.2d 1149, 1155 (1st Cir. 1992) (permitting amendment using Rule 15(a)'s standards after the scheduling order cutoff "would have nullified the purpose of Rule 16(b)(1)").

Once a scheduling order deadline to amend a pleading has expired, the party seeking to amend is effectively asking the court for leave to amend both the scheduling order and the pleading. *See, e.g., Johnson,* 975 F.2d at 607-08; *SIL-FLO*, 917 F.2d at 1518. If the movant satisfies Rule

13

16(b), the court must then determine whether to grant leave to amend under Rule 15(a).  *See Johnson*, 975 F.2d at 608; *Tschantz v. McCann*, 160 F.R.D. 568, 571 (N.D. Ind. 1995); *American Tourmaline Fields*, 1998 WL 874825, at *2 (N.D. Tex. Dec. 7, 1998).  Rule 16(b) requires that a party seeking to modify a scheduling order show good cause.  *See* FED. R. CIV. P. 16(b); *Reliance Ins. Co. v. Louisiana Land & Exploration Co.*, 110 F.3d 253, 257 (5th Cir. 1997); *Barrett v. Atlantic Richfield Co.*, 95 F.3d 375, 380 (5th Cir. 1996).

To demonstrate "good cause," the movant must show that, despite diligence, he could not have reasonably met the scheduling deadline.  6A WRIGHT, ET AL., FEDERAL PRACTICE & PROCEDURE, § 1522.1 at 231 (2d ed.1990).  A court may deny a motion for leave to amend if the movant "knows or should have known of the facts upon which the proposed amendment is based but fails to include them in the original complaint."  *Pallottino v. City of Rio Rancho*, 31 F.3d 1023, 1027 (10th Cir.1994); *Pope v. MCI Telecommunications, Inc.*, 937 F.2d 258, 263 (5th Cir. 1991) (denying, under Rule 15(a)'s more lenient standard, a late-filed motion to amend a complaint to include claims based on same facts); *Sosa*, 133 F.3d at 1419 (denying leave to amend under Rule 16(b) when the facts were known to plaintiff at the time of the first complaint); *Parker,* 204 F.3d at 340 (same).

If a movant establishes "good cause" to extend the deadline for pleading amendments, the court then decides whether to grant leave to file the amended pleading under Rule 15(a).  *See Johnson*, 975 F.2d at 608; *Tschantz*, 160 F.R.D. at 571; *American Tourmaline Fields*, 1998 WL 874825, at *2.  In deciding whether to grant leave to file an amended pleading, a district court may consider factors such as undue delay, undue prejudice to the opposing party, and futility of amendment.  *See Foman v. Davis*, 371 U.S. 178, 182 (1962); *Wimm v. Jack Eckerd Corp.*, 3 F.3d 137, 139 (5th Cir. 1993).

14

Saldivar seeks to amend his pleadings in two respects.  The first is to add a new claim for negligent retention and supervision against DARS and the three proposed additional defendants. The second would join Frankie Watson, Terry Smith, and Mike Schepperly as additional defendants. (Docket Entry No. 22 at 1-2).  Saldivar argues that these change would not cause prejudice because "all claims are arising out of the same transaction and all parties have had notice of the suit."  (*Id.* at 2).  But the "good cause" requirement of Rule 16 focuses on the diligence of the party asking the court to modify the scheduling order.  *Parker,* 204 F.3d at 340; *In re Milk Prods.,* 195 F.3d at 437; *Johnson,* 975 F.2d at 609; *Marcum v. Zimmer,* 163 F.R.D. 250, 254 (S.D. W.Va. 1995).  The absence of prejudice to the nonmovant is relevant to Rule 15(a) but does not satisfy the "good cause" requirement of Rule 16(b).  *Tschantz,* 160 F.R.D. at 571.

Saldivar did not move for leave to amend until after DARS filed it motion for summary judgment.  The Fifth Circuit has explained that "we more carefully scrutinize a party's attempt to raise new theories of recovery by amendment when the opposing party has filed a motion for summary judgment."  *Parish v. Frazier*, 195 F.3d 761, 764 (5th Cir. 1999).  Although a pending summary judgment motion does not automatically bar amendments, it is "significant in the determination whether a plaintiff's subsequent motion to amend is timely."  *Little v. Liquid Air Corp.*, 952 F.2d 841, 846 n.2 (5th Cir.1992).

Saldivar has not shown good cause for the delay in raising the additional claim or adding the three new defendants.  He asserts that the motion for leave to amend arose "[t]hrough recent developments during discovery," (Docket Entry No.22 at 1), but does not explain what those developments were or why the motion was filed after the discovery cutoff and after DARS moved for summary judgment.  His proposed amended pleading does not allege, and is not based on, any newly discovered facts.  Instead, the proposed amendments assert a new claim and name new

15

defendants based on the same facts contained in earlier pleadings.  Saldivar knew that Watson was Boyce's supervisor and Smith was Watson's.  He knew that Schepperly had reviewed his cases because Boyce and Saldivar met to discuss Schepperly's findings.  (Docket Entry No. 19, Ex. 2, Saldivar Depo at 57-59).  Saldivar had also amended twice before.

DARS suggests that Saldivar decided to seek an amendment after reading DARS's summary judgment argument that it was not a "person" under § 1983.  Saldivar wants to add the negligence claim and individual defendants, the argument goes, as a way around the roadblock posed by that statutory argument.  The absence of any other explanation from Saldivar suggests that DARS might be right.  If so, that is not a basis for finding good cause.  Even if DARS is wrong about Saldivar's reason, Saldivar has not satisfied his burden to show good cause for the delay in the proposed amendment.

To the extent that Saldivar is seeking to add new defendants, the proposed amendments are also futile.  The claims against the new defendants are barred by limitations.  In § 1983 actions, state tort law determines the limitations period.  *Owens v. Okure*, 488 U.S. 235, 109 S. Ct. 573, 582 (1989); *Slack v. Carpenter*, 7 F.3d 418, 419 (5th Cir.1993); *Henson-El v. Rogers*, 923 F.2d 51, 52 (5th Cir. 1991).   In Texas, that period is set by statute at two years from the date the claim accrues.  TEX. CIV. PRAC. & REM. CODE § 16.003(a); *see also Henson-El*, 923 F.2d at 52.  The time at which the claim accrues is a matter of federal law.  *Rodriguez v. Holmes*, 963 F.2d 799, 803 (5th Cir. 1992).  Under the Fifth Circuit's "discovery rule," a § 1983 claim accrues when the plaintiff knows or has reason to know of the injury on which his suit is based. *Rubin v. O'Koren*, 621 F.2d 114, 116 (5th Cir. 1980) (citations omitted).  The limitations period begins to run when the plaintiff is or should be aware of the "critical facts that he has been hurt and who has inflicted the injury. . . ." *Lavellee v. Listi*, 611 F.2d 1129, 1130 (5th Cir. 1980) (quotation marks omitted).  Negligent

16

retention or supervision is subject to the same two-year limitations period.  TEX. CIV. PRAC. & REM. CODE § 16.003(a).  A negligence claim, however, accrues when the breach of duty occurs.  *Kansa Reinsurance v. Congressional Mortgage Corp.*, 20 F.3d 1362, 1366-70 (5th Cir. 1994).

Saldivar testified that by November or December 2006, he believed he was not being promoted in retaliation for having complained about Olson.  (Docket Entry No. 25, Ex. S at 13-14).  Applying the discovery rule, Saldivar was required to add the individual defendants by November or December 2008.  The latest date the statute of limitations could possibly have begun is at the end of March 2007, when Saldivar was promoted.  At the latest, he had to add the new defendants by March 2009.  Saldivar did not file his motion for leave to amend until May 21, 2009, after limitations had expired.  The proposed amendments adding the new defendants are denied as futile.[4]

---

[4]  Rule 15(c)'s relation-back doctrine does not save Saldivar's claims against the individual defendants. Under the rule, amended pleadings relate back to the date of the original pleading when:

> (A) the law that provides the applicable statute of limitations allows relation back;
>
> (B) the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out — or attempted to be set out — in the original pleading; or
>
> (C) the amendment changes the party or the naming of the party against whom a claim is asserted, if Rule 15(c)(1)(B) is satisfied and if, within the period provided by Rule 4(m) for serving the summons and complaint, the party to be brought in by amendment:
>
> > (i) received such notice of the action that it will not be prejudiced in defending on the merits; and
> >
> > (ii) knew or should have known that the action would have been brought against it, but for a mistake concerning the proper party's identity.

FED. R. CIV. P. 15(c).  The Texas personal injury statute of limitations does not provide for relation back when new parties are added.  *See* TEX. CIV. PRAC. & REM. CODE § 16.068; *Alexander v. Turtur & Assoc., Inc.*, 146 S.W.3d 113, 121 (Tex. 2004) ("Ordinarily, an amended pleading adding a new party does not relate back to the original pleading.").  Subsection (B) is not applicable to the extent that Saldivar's amendments seek to add

The proposed amendment adding the negligent retention and hiring claim against DARS is not barred by limitations. This claim related back to the original complaint. *See* FED. R. CIV. P. 15(c); TEX. CIV. PRAC. & REM. CODE § 16.068. That does not, however, avoid the result mandated by Rule 16; Saldivar has not shown good cause for his failure to comply with the scheduling order deadline and permitting this amendment after the discovery and motions deadlines is prejudicial to DARS. Adding this new cause of action would require reopening the depositions and allowing a new round of summary judgment briefing.

Saldivar's motion for leave to amend is denied.

## III.   The Summary Judgment Motion

### A.   The Legal Standard

Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c). "The movant bears the burden of identifying those portions of the record it believes demonstrate the absence of a genuine issue of material fact." *Triple Tee Golf, Inc. v. Nike, Inc.*, 485 F.3d 253, 261 (5th Cir. 2007) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–25 (1986)).

If the burden of proof at trial lies with the nonmoving party, the movant may satisfy its initial burden by "'showing' – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case." *See Celotex*, 477 U.S. at 325. While the party

---

new parties because such amendments are subject to subsection (C). Subsection (C) incorporates the requirements of subsection (B) and includes two additional requirements. Within 120 days of filing the original complaint – the period provided by Rule 4(m) – the party sought to be added must have had notice of the action and either known or should have known that the action would have been brought against it absent a mistake as to identity. Saldivar was aware of who Boyce, Smith, and Scheperly were and what their involvement in the case was. *See Garvin v. City of Philadelphia*, 354 F.3d 215, 222 (3d Cir. 2003) ("Of course, an amended complaint will not relate back if the plaintiff had been aware of the identity of the newly named parties when she filed her original compliant and simply chose not to sue them at that time.").

moving for summary judgment must demonstrate the absence of a genuine issue of material fact, it does not need to negate the elements of the nonmovant's case. *Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 540 (5th Cir. 2005) (citation omitted). "A fact is 'material' if its resolution in favor of one party might affect the outcome of the lawsuit under governing law." *Sossamon v. Lone Star State of Texas*, 560 F.3d 316, 326 (5th Cir. 2009) (quotation omitted). "If the moving party fails to meet [its] initial burden, the motion [for summary judgment] must be denied, regardless of the nonmovant's response." *United States v. $92,203.00 in U.S. Currency*, 537 F.3d 504, 507 (5th Cir. 2008) (quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc)).

When the moving party has met its Rule 56(c) burden, the nonmoving party cannot survive a summary judgment motion by resting on the mere allegations of its pleadings. The nonmovant must identify specific evidence in the record and articulate how that evidence supports that party's claim. *Baranowski v. Hart*, 486 F.3d 112, 119 (5th Cir. 2007). "This burden will not be satisfied by 'some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence.'" *Boudreaux*, 402 F.3d at 540 (quoting *Little*, 37 F.3d at 1075). In deciding a summary judgment motion, the court draws all reasonable inferences in the light most favorable to the nonmoving party. *Connors v. Graves*, 538 F.3d 373, 376 (5th Cir. 2008).

### B.    Saldivar's Texas Whistleblower Act Claim

The Texas Whistleblower Act shields government employees from employer retaliation arising out of reporting unlawful conduct. TEX. GOV'T CODE § 554.001, *et seq*. The Act is intended not only to protect employees but also to encourage responsible behavior by government entities. *Harris County v. Lawson*, 122 S.W.3d 276, 280 (Tex. App.–Houston [1st Dist.] 2003, pet. denied), *disapproved of on other grounds by University of Texas Medical Branch at Galveston v. Barrett*, 159 S.W.3d 631, 633 (Tex. 2005). DARS has moved for summary judgment on Saldivar's

19

Whistleblower Act claim, arguing that his claim does not fit within the text of the Act and that the statute of limitations bars his claim.[5]

A plaintiff must file suit under the Texas Whistleblower Act within 90 days after the alleged violation occurred or "was discovered by the employee through reasonable diligence." TEX. GOV'T CODE § 554.005.  Courts have interpreted § 554.005 as giving plaintiffs the benefit of the longer of the two alternatives.  *See Texas A&M Univ. at Corpus Christi v. Hamann*, 3 S.W.3d 215, 217-18 (Tex. App.–Corpus Christi, 1999, pet. denied).  Ordinarily, plaintiffs will prefer the discovery rule.

Saldivar claims that DARS violated the Whistleblower Act by delaying his promotion in retaliation for his report of Olson's conduct.  Saldivar reported Olson's behavior on August 30, 2005.  Boyce first recommended Saldivar for promotion to VRC III on January 1, 2006.  (Docket Entry No. 25, Ex. J).  She recommended him again on February 1, 2006.  (*Id.*, Ex. K).  Frankie Watson took no action in response to either recommendation.  (*Id.*, Ex. Q , Boyce Depo. at 57-61.).  Boyce recommended Saldivar for promotion again on October 13, 2006 and again on November 30, 2006.  (*Id.*, Exs. L, M).  No action was taken.  In March 2007, Mike Schepperly reviewed Saldivar's file with Boyce and made some corrections to Saldivar's work.  (*Id.*, Ex. Q, Boyce Depo. at 59-61).  On March 28, 2007, Boyce submitted another recommendation that Saldivar be promoted.  Watson approved this recommendation.  (*Id.*, Ex. O).  On April 1, 2007, Saldivar became a VRC III.  (*Id.*, Ex. Q, Boyce Depo. at 129-30).  Saldivar testified in his initial deposition that he should have been promoted in October  2005 and that he first began to suspect the delay was retaliatory in 2005.

---

[5]  Saldivar's summary judgment response does not address the Whistleblower Act claim.  (Docket Entry No. 25).  In a footnote to its response to Saldivar's motion for leave to amend, DARS argues: "Plaintiff has clearly abandoned his claim for violations of the Texas Whistleblower statute, as he did not respond to Defendants' Motion for Summary Judgment on that point.  Plaintiff's counsel has verbally confirmed this fact to Defendant's counsel as well, but has not yet affirmatively conceded the issue in open court."  (Docket Entry No. 26 at 2 n.1).  Saldivar has, however, included the Whistleblower Act claim in his proposed Third Amended Petition.

(Docket Entry No. 19, Ex. B at 108-10, 143).  In a subsequent deposition, he changed his testimony and said that he first realized that he was not receiving the promotion to VCR III because of retaliation in November or December 2006.  (Docket Entry No. 25, Ex. S at 13-14).

Saldivar filed suit in state court on November 5, 2007.  (Docket Entry No. 1, Ex. 1 at 8).  Filing nearly two years after the first recommendation for promotion and seven months after he actually got the promotion does not satisfy the 90-day statute of limitations under the most generous approach.[6]  DARS is entitled to summary judgment on that basis.

DARS is also entitled to judgment as a matter of law on the merits of Saldivar's Whistleblower Act claim.  The Act provides in relevant part:

> A state or local government entity may not suspend or terminate the employment of, or take other adverse personnel action against, a public employee who in good faith reports a violation of law by the employing governmental entity or another public employee to an appropriate law enforcement authority.

TEX. GOV'T CODE § 554.002(a).  The elements of the claim include reporting "a violation of law"; reporting conduct attributable to the employing governmental entity or another public employee; and reporting to an "appropriate law enforcement authority."

The Act defines "law" as "a state or federal statute, an ordinance of a local government entity, or a rule adopted under a statute or ordinance."  TEX. GOV'T CODE § 554.001(1).  Whether complained-of conduct is a "violation of law" is a question of law for the court.  *Rogers v. City of Fort Worth*, 89 S.W.3d 265, 274 (Tex. App.–Fort Worth 2002, no pet.).  To succeed on a

---

[6]  DARS also argues that Saldivar failed to use the DARS internal grievance procedure, which the Whistleblower Act requires him to do before filing suit.  (Docket Entry No. 19 at 9, 10); *see* TEX. GOV'T CODE § 554.006.  Saldivar admits that he did not file any grievance.  (Docket Entry No. 19, Ex. B at 146-47).  There is no evidence in the record about any DARS grievance procedure.  Summary judgment cannot be granted on the ground that Saldivar failed to file a presuit grievance.

21

Whistleblower Act claim, the plaintiff need not prove that any law was actually violated, "[b]ut there must be some law prohibiting the complained-of conduct to give rise to a whistleblower claim." *Texas Dept. of Criminal Justice v. McElyea*, 239 S.W.3d 842, 850 (Tex.App.–Austin 2007, pet. denied).

In his August 30, 2005 e-mail to Stephanie Jenkins and Terry Boyce, Saldivar described Olson's conduct as "unethical" because it "seems as if Mr. Olson is out to exploit the agency as well as our consumers." (Docket Entry No. 19, Ex. A at 2). Saldivar did not say anything about a violation of law. DARS characterizes Saldivar's complaint as identifying only a violation of an internal agency rule, which would not trigger the Whistleblower Act. (Docket Entry No. 19 at 5). This argument is unpersuasive. Under the Whistleblower Act, an "employee need not identify a specific law when making a report." *Llanes v. Corpus Christi Ind. School Dist.*, 64 S.W.3d 638, 642 (Tex.App.–Corpus Christi 2001, pet. denied). Saldivar alleged and provided summary judgment evidence that he reported his concern that Olson was engaged in unlawful conduct to obtain state funds. When asked in his deposition if he "felt like Mr. Olson was potentially violating the law," Saldivar responded, "[y]es, definitely." (Docket Entry No. 19, Ex. B at 61).

The second question  is whether Saldivar reported conduct committed by "the employing governmental entity (DARS) or another public employee." TEX. GOV'T CODE § 554.002(a). The statute defines "public employee" as "an employee or appointed officer *other than an independent contractor* who is paid to perform services for a state or local governmental agency." TEX. GOV'T CODE § 554.001(4) (emphasis added). Olson was not a public employee. He was the director of the Association for the Developmentally Disabled and provided services as an outside vendor to DARS. Saldivar testified in his deposition that there is a "process" vendors "have to go through with the State" before they may serve DARS consumers. (Docket Entry No. 19, Ex. B at 18). Saldivar was

22

not sure if the vendors, including Olson, were state-certified or state-licensed. (*Id.*). But even a certification or license from the State of Texas would not transform Olson's violations of law into violations by DARS, "the employing governmental entity." *See* TEX. GOV'T CODE § 554.002(a); *see also Denton v. Morgan*, 136 F.3d 1038, 1045-46 (5th Cir. 1998) (upholding judgment as a matter of law for the defendant on a Texas Whistleblower Act claim because the plaintiff, who worked for a juvenile probation board, reported the illegal conduct of a school district, even though plaintiff's employer participated in the meeting in which the school district made the allegedly unlawful decision). Saldivar has not identified or submitted any evidence that Olson was making false claims at the direction of DARS or with DARS's express or implied consent. In his deposition, Saldivar testified that, as he understood the law, he had not seen anyone "from DARS" breaking the law. (Docket Entry No. 19, Ex. B at 61). The record does not disclose any basis on which a factfinder could infer that he reported violations of law by DARS. Because the second element cannot be shown, there is no need to decide whether Saldivar reported to "an appropriate law enforcement authority." *See* TEX. GOV'T CODE § 554.002(a).[7]

The record establishes that, as a matter of law, Saldivar did not file his claim within the 90-day limitations period and did not report a violation by DARS. The motion for summary judgment on the Texas Whistleblower Act claim is granted.

### C.   Saldivar's § 1983 Claim Against DARS

---

[7]  Under the Texas Whistleblower Act, an entity is an appropriate law enforcement authority if it is part of the federal or a state or local government and the employee in good faith believes it is authorized to: "(1) regulate under or enforce the law alleged to be violated in the report; or (2) investigate or prosecute a violation of criminal law." *See* TEX. GOV'T CODE § 554.002(b). DARS focuses only on Saldivar's reports to Jenkins and Boyce, arguing correctly that they are not law-enforcement personnel despite authority to impose internal discipline for violations of DARS policy. *See Texas Dept. of Transp. v. Needham*, 82 S.W.3d. 314, 320 (Tex. 2002). DARS ignores the evidence that Saldivar contacted someone named Francisco Teran or Turon who might have been with the Texas Attorney General's office. (Docket Entry No. 19, Ex. B at 40).

Saldivar alleges that DARS retaliated against him by delaying his promotion after he exercised his First Amendment right to speak out on a matter of public concern.  (Docket Entry No. 1-7 at 7-8).  DARS has moved for summary judgment on that claim, arguing that it is not subject to suit under § 1983; that Saldivar's speech did not bear on a matter of public concern; and that Saldivar has produced no evidence causally linking any delay in his promotion to his complaint about Olson.  (Docket Entry No. 19 at 11-14).

Section 1983 provides a private right of action against "[e]very *person* who, under color of [state law] subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws. . . ."  42 U.S.C. § 1983 (emphasis added).  DARS contends that, as a state agency, it is not a "person" subject to liability under § 1983.  (Docket Entry No. 19 at 12).  The Supreme Court has held that "a State is not a person within the meaning of § 1983."  *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 64 (1989).  Saldivar agrees that DARS falls outside the definition of "person."  But he argues that DARS has waived its sovereign immunity from suit by removing this case to federal court and participating in discovery before moving for summary dismissal.  (Docket Entry No. 24 at 7-13).

The Eleventh Amendment bars suits by individuals against a state for money damages unless the state has consented to suit.  U.S. CONST. amend. XI; *see also Hans v. Louisiana*, 134  U.S. 1 (1890) (extending construction of the Amendment to bar suits by citizens against their own state); *Alden v. Maine*, 527 U.S. 706 (1999) (holding that the Eleventh Amendment also provides immunity to states sued in state court).  For Eleventh Amendment purposes, a suit against a state agency "is a suit against the state."  *Daigle v. Gulf State Utilities Company*, 794 F.2d 974, 980 (5th Cir.1986).  A state's immunity from suit, however, is not absolute.  *Meyers v. Texas*, 410 F.3d 236, 241 (5th Cir.

24

2005).  First, Congress can abrogate Eleventh Amendment immunity without a state's consent when acting under its enforcement authority provided by § 5 of the Fourteenth Amendment.  *Seminole Tribe of Florida v. Florida*, 517 U.S. 44 (1996); *Atascadero State Hospital v. Scanlon*, 473 U.S. 234, 238  (1985).  Second, under *Ex Parte Young*, 209 U.S. 123 (1908), a suit is not subject to Eleventh Amendment immunity if the suit is "brought against individual persons in their official capacities as agents of the state, and the relief sought [is] declaratory or injunctive in nature and prospective in effect."  *Aguilar v. Texas Dep't of Crim. Justice*, 160 F.3d 1052, 1054 (5th Cir.1998).  Third,  a state "may waive its sovereign immunity by consenting to suit."  *College Savings Bank v. Florida Prepaid Postsecondary Education Expense Board*, 527 U.S. 666, 670 (1999).  Waiver is present if the state voluntarily invokes federal-court jurisdiction or makes a clear declaration that it intends to submit itself to federal-court jurisdiction.  *Meyers*, 410 F.3d at 241.

Because removing a suit to federal court voluntarily invokes federal-court jurisdiction, removal generally waives Eleventh Amendment immunity.  *Id.*; *Lapides v. Bd. of Regents of the Univ. Sys. of Georgia*, 535 U.S. 613, 617, 122 S. Ct. 1640 (2002).  As the Supreme Court has explained, "[i]t would seem anomalous or inconsistent for a State both (1) to invoke federal jurisdiction, thereby contending that the 'Judicial power of the United States' extends to the case at hand, and (2) to claim Eleventh Amendment immunity, thereby denying that the 'Judicial power of the United States' extends to the case at hand.  And a Constitution that permitted states to follow their litigation interests by freely asserting both claims in the same case could generate seriously unfair results."  *Lapides*, 535 U.S. at 619.  Although *Lapides* is limited by its facts to state-law claims over which the state has already waived immunity in state court, its reasoning applies more broadly.  *See* ERWIN CHEMERINSKY, FEDERAL JURISDICTION 459 (5th ed. 2007) ("But the Court's reasoning means that the case likely has broader implications: if the state removes a case from state

25

to federal court, it has made the choice to invoke federal jurisdiction and thus waives its sovereign immunity."). The Fifth Circuit recognized as much, holding that "the voluntary invocation principle applies generally in *all cases* for the sake of consistency, in order to prevent and ward off all actual and potential unfairness, whether egregious or seemingly innocuous." *Meyers*, 410 F.3d at 249 (emphasis added).

In *Lapides*, as in the present case, the plaintiffs asserted state-law claims as well as a § 1983 claim. *Lapides*, 535 U.S. at 616. Although the Supreme Court found that the state had waived its immunity from suit on the state-law claims by removing to federal court, the Court declined to address the § 1983 claim because "we have held that the state is not a 'person' against whom a § 1983 claim for money damages might be asserted. . . [h]ence this case does not present a valid federal claim against the State." *Id.* at 1643 (citing *Will*, 491 U.S. at 66). The Seventh Circuit, in a case decided just after *Lapides*, similarly found that the state waived its immunity on the plaintiff's state-law claims by removing to federal court. With respect to the plaintiff's § 1983 claim, the court saw "no reason to reach the Eleventh Amendment issue, because the state is not a 'person' that can be sued in this way under 42 U.S.C. § 1983." *Omosegbon v. Wells*, 335 F.3d 668, 672-73 (7th Cir. 2003) (citing *Will*, 491 U.S. at 71). *Lapides* appears to foreclose Saldivar's § 1983 claim even if Eleventh Amendment immunity has been waived by removal. *See* 2 SHELDON H. NAHMOD, CIVIL RIGHTS AND CIVIL LIBERTIES LITIGATION § 6:69 (4th ed. 2009) ("Now that the Court [in *Will*] has made clear that the issue is one of statutory interpretation and not Eleventh Amendment application, a § 1983 plaintiff in federal court can no longer argue that the defendant state has waived its Eleventh Amendment immunity.").

The relationship between the state's Eleventh Amendment immunity and the interpretation of § 1983 to preclude a suit against a state because it is not a "person" has an interesting history.

When the Supreme Court decided *Alden* in 1999, it extended sovereign immunity to protect states from being sued in state court without their consent. *Alden*, 527 U.S. at 712. If *Alden* had been decided ten years earlier, the issue in *Will* would not have mattered. In *Will*, the plaintiff sued a state entity under § 1983 in state court, alleging that he was denied a promotion in violation of the First Amendment. That question would have been irrelevant if the Eleventh Amendment applied to suits filed in state courts. The *Will* decision was necessary only because at that time, "[t]he Eleventh Amendment applie[d] only to bar suits in federal court." CHEMERINSKY, FEDERAL JURISDICTION 560. In dissent, Justice Brennan characterized the Court's decision in *Will* as covertly applying the Eleventh Amendment to suits filed in state court. *Will*, 491 U.S. at 71-72 (Brennan, J., dissenting) ("Like the guest who would not leave, however, the Eleventh Amendment lurks everywhere in today's decision and, in truth, determines its outcome."). In one recent case, the Fifth Circuit held that a state had not waived its Eleventh Amendment immunity and expressly took no position on the plaintiff's argument that "*Will* should not apply when sovereign immunity is waived." *In re Katrina Canal Breaches Litig.*, 309 F.App'x. 833, 835 (5th Cir. 2009) (per curiam) (unpublished). But in other, precedential cases, the Fifth Circuit has continued to apply the *Will* rule even when, as here, the state removed and waived its Eleventh Amendment immunity. In *Stotter v. Univ. of Texas at San Antonio*, 508 F.3d 812, 821 (5th Cir. 2007), the plaintiff sued a state university and several university administrators alleging a § 1983 procedural due process claim and First Amendment and equal protection violations. The case was removed to federal court. The Fifth Circuit affirmed the district court's grant of summary judgment on the § 1983 claim against the state, holding that it was barred by the Supreme Court's holding in *Will* that a state is not a "person" under § 1983 in suits for damages. *Id.* at 821.

27

Under the applicable Supreme Court and Fifth Circuit authority, although DARS waived its Eleventh Amendment immunity by removing to federal court, it is nonetheless not subject to suit under § 1983 because it is not a "person" under that statute.[8]  Like the plaintiff in *Lapides*, Saldivar never "present[ed] a valid federal claim against the State" because DARS is not a "person."  *See Lapides*, 535 U.S. at 617 (citing *Will*, 491 U.S. at 66).  DARS is entitled to summary judgment on the § 1983 claim.

## IV.   Conclusion

This court grants DARS's motion for summary judgment.  Saldivar's motion for leave to amend is denied.  Final judgment is entered by separate order.

SIGNED on October 13, 2009, at Houston, Texas.

Lee H. Rosenthal
United States District Judge

---

[8] Several Court of Appeals opinions have described the rule as jurisdictional.  *See, e.g., Gulf Park Water Co. v. Mississippi Dept. of Environmental Quality*, 59 F.3d 1241, 1241 (5th Cir. 1995) (unpublished) (per curiam) (describing arguments based on the *Will* rule, the Eleventh Amendment, and a rule preventing review of a state court's findings as "jurisdictional and quasi-jurisdictional contentions," without explaining which falls into which category);  *Weller v. Dept. of Social Services*, 901 F.2d 387, 396 (4th. Cir 1990) ("Since the state is not a person under § 1983, we note the existence of jurisdiction pursuant to 28 U.S.C. § 1343 for a claim under 42 U.S.C. § 1983 only against those defendants who are not state agencies or state officials.");  *Moore v. City of Harriman*, 272 F.3d 769, 772 (6th Cir. 2001) (en banc) (citing *Wells v. Brown*, 891 F.3d 591, 592-93 (6th Cir. 1995)) (". . . § 1983 claimants must plead capacity for jurisdictional reasons.");  *Anderson v. Illinois*, 70 F.3d 1274, 1995 WL 687654, at *1 (7th Cir. 1995) (unpublished) ("Section 1983 does not authorize litigation against a state in its own name, so the suit against the state of Illinois must be dismissed for want of jurisdiction rather than on the merits.");  *Elam Construction, Inc. v. Regional Transportation Dist.*, 129 F.3d 1343, 1345 (10th Cir. 1997 (the defendant's argument that it is not a "person," "if successful, could have meant this court lacked jurisdiction to entertain this action.").

28